**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| MICHELLE M. MEARS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 3:25-cv-01392<br><br>JUDGE JEFFREY J. HELMICK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Michelle M. Mears ("Plaintiff" or "Ms. Mears") seeks judicial review of the final decision of Defendant Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **REVERSE and REMAND** this matter pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings. On remand, the ALJ should consider the entire record and provide an accurate and well-reasoned explanation to support her findings regarding the persuasiveness of all medical opinion evidence, including the medical opinions of treating rheumatologist Nezam Altorok, M.D., ensuring that her stated rationale builds an accurate and logical bridge between the evidence and the result. The ALJ should also ensure that her analysis of evidence and limitations relevant to fibromyalgia is consistent with the governing regulations, SSR 12-2p, and Sixth Circuit precedent.

## I. Procedural History

Plaintiff filed her DIB application on March 1, 2023, alleging an onset date of June 1, 2022. (Tr. 17, 84, 203-04.) She alleged disability due to fibromyalgia ("FM"), seronegative rheumatoid arthritis, anisocoria, depression, ocular migraines, and anxiety. (Tr. 24, 114, 124, 255, 272.) Her application was denied initially and upon reconsideration (Tr. 110-14, 121-24), and she requested a hearing (Tr. 125-26). After conducting a hearing (Tr. 49-83), an Administrative Law Judge ("ALJ") issued a decision denying her application on August 16, 2024 (Tr. 14-48). On May 30, 2025, the Appeals Council denied Ms. Mears's request for review, making the August 16, 2024 decision the final decision of the Commissioner. (Tr. 1-6.)

Ms. Mears filed her Complaint on July 2, 2025, challenging the Commissioner's final decision denying her application for disability benefits. (ECF Doc. 1.) The matter is fully briefed. (ECF Docs. 7, 10 & 12.) Ms. Mears raises two issues in this appeal:

(1) the Commissioner erred in analyzing the medical source opinions, resulting in a residual functional capacity and an ultimate decision not based on substantial evidence; and

(2) the ALJ erred in accepting flawed vocational testimony as to the existence of jobs.

(ECF Doc. 7, pp. 1, 16-25; ECF Doc. 12.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Mears was born in 1986 and was 35 years old on the alleged disability onset date, making her a younger individual under Social Security regulations. (Tr. 40, 84, 251.) She has a high school education, plus two years in college. (Tr. 40, 55, 256.) She previously had a real estate license, but it was on hold at the time of the hearing. (Tr. 55, 251.) She has worked as an

account liaison, administrative assistant, dishwasher, and cake decorator / truck unloader. (Tr. 57-63, 73, 257.) She stopped working at the end of 2022. (Tr. 255.)

**B. Medical Evidence**

**1. Relevant Treatment History**

**i. Evidence Pre-Dating Alleged Onset Date**

Prior to the alleged onset date, Ms. Mears was treated by Brenda Cole, Ph.D., at Psychological Resources of Toledo, Ltd. (Tr. 356-62, 534-62.) Dr. Cole last saw Ms. Mears on December 27, 2021. (Tr. 356.) Ms. Mears's diagnoses at that time were dysthymic disorder and generalized anxiety disorder. (Tr. 361.) She was not on any medication. (Tr. 359, 361.) Although Ms. Mears was referred for psychological testing, she reported being unable to complete the testing due to cost. (Tr. 358, 361.)

On April 11, 2022, Ms. Mears presented to rheumatologist Yue Ding, M.D., University of Toledo Medical Center (UT) for a six month follow up regarding seronegative rheumatoid arthritis. (Tr. 616.) She complained of left knee pain and difficulty with stairs. (*Id.*) She also reported joint pain, mostly in her feet and ankles, and all over body pain which was suspected to be due to FM. (Tr. 618.) Examination findings were normal except for crepitus in the knees. (Tr. 618-19.) She was diagnosed with osteoarthritis, FM, and multiple joint pain. (Tr. 619.) On April 26, 2022, she presented to internist Chiamaka Mbaso, M.D., at UT for her FM. (Tr. 375.) She reported exercise intolerance due to pain, muscle aches, joint pain, swelling in the extremities, anxiety, depression, and fatigue. (Tr. 377.) She was noted to be obese and depressed. (*Id.*) Otherwise, her examination findings were normal. (*Id.*) She was started on amitriptyline 10 mg for FM and advised of the importance of exercise for FM. (*Id.*) She was referred to psychiatry for mixed anxiety and depressive disorder. (*Id.*) On May 24, 2022, Ms.

Mears returned to Dr. Ding. (Tr. 612.) She reported her left knee pain was worse. (Tr. 614.) She also reported joint pain, particularly in her feet, ankles, knees, and hips, and pain on her skin when pressure was applied. (*Id.*) She reported extreme fatigue throughout the day. (*Id.*) She said that amitriptyline helped with her pain, but she discontinued it after a week due to mouth sores/ulcers and loss of taste. (*Id.*) Examination findings were normal. (Tr. 614-15.)

**ii. Evidence Post-Dating Alleged Onset Date**

On July 12, 2022, Ms. Mears presented to Joseph Kamel, D.O., at the RHC Psychiatry Clinic at UT (Tr. 845-51) for an initial psychiatric evaluation to establish care for ongoing anxious and depressive symptoms (Tr. 849). She reported seeing multiple doctors for progressively worsening physical pain for a few years, but said her doctors were having a difficult time diagnosing the cause of her physical pain. (*Id.*) Pain limited her ability to enjoy activities she once enjoyed, like going on long walks, and her mood had progressively gotten worse due to her pain-related symptoms. (*Id.*) She reported working as an artist from home. (Tr. 850.) She had started a new relationship three months earlier and felt that her partner was supportive. (*Id.*) Ms. Mears's mental status examination findings were unremarkable. (*Id.*) She was diagnosed with generalized anxiety disorder and major depressive disorder, and started on Cymbalta 30 mg once a day for management of major depressive disorder. (Tr. 836, 851.)

On August 16, 2022, Ms. Mears returned to Dr. Kamel for medication management. (Tr. 834.) She reported taking her medication with no side effects and a lot of improvement in her overall mood. (Tr. 836.) Mental status examination findings were unremarkable. (Tr. 837.) Cymbalta was continued and Ms. Mears was given a handout for psychotherapy referrals. (*Id.*)

A September 2, 2022 MRI of Plaintiff's right knee showed: mild tricompartmental degenerative changes without advanced arthritis, joint effusion, or Baker's cyst; mild

degenerative signal in the medial meniscus without a discrete tear or cyst; and intact structural ligaments. (Tr. 411-12, 630.)

On September 27, 2022, Ms. Mears presented to Nezam Altorok, M.D., at UT (Tr. 464-66.) She complained of joint pain, diffuse pain all over her body with morning stiffness and fatigue, and pain in her feet and left knee. (Tr. 464.) Her left knee pain had worsened over the past year, with severe pain that affected her quality of life. (*Id.*) Dr. Altorok noted Ms. Mears had features of hypermobility. (*Id.*) On examination, she was in no acute distress and had a normal appearance. (Tr. 465.) She had musculoskeletal tenderness but no swelling or edema and a normal range of motion. (*Id.*) There was no motor weakness, focal deficit, or cranial nerve deficit. (Tr. 465-66.) Her mood and behavior were normal. (Tr. 466.) Dr. Altorok noted diffuse soft tissue tender spots consistent with FM. (*Id.*) He ordered a left knee MRI and noted a history of autoimmune hepatitis and LFT abnormalities from Methotrexate, with no current medications for the condition. (Tr. 466.) Dr. Altorok continued Ms. Mears's prescription for duloxetine for FM, noting she was not interested in more intensive treatment. (*Id.*)

On November 16, 2022, Ms. Mears presented to Dr. Altorok and Dr. Aya Abugharbyeh, M.D., for follow up regarding her MRI and rheumatoid arthritis. (Tr. 458, 514.) She reported severe pain in both knees, exacerbated by movement, and swelling in her hands. (Tr. 458.) She also reported she could "barely walk and function due to pain." (*Id.*) She had not been able to get an MRI of her knee because insurance had not approved it yet. (*Id.*) Examination findings were normal except for tenderness in the right knee. (Tr. 459.) Ms. Mears was diagnosed with joint pain. (Tr. 459, 460.) Dr. Altorok ordered lab work and referred Ms. Mears to physical therapy. (Tr. 460.) Dr. Altorok noted that Ms. Mears had been diagnosed with seronegative rheumatoid arthritis years earlier but failed treatment with Methotrexate (which caused liver

failure) and Humira (which was not effective). (*Id.*) He also noted Ms. Mears's history of autoimmune hepatitis and continued Ms. Mears's prescription for duloxetine for FM. (Tr. 460.)

On December 13, 2022, Ms. Mears returned to Dr. Altorok, complaining of eye pain with floaters, sensitivity to light without complete loss of vision, and pain in her back, elbow, wrists, and knees. (Tr. 595.) Dr. Altorok noted she had FM and pain in her back and knees. (*Id.*) Ms. Mears had failed Methotrexate in the past, but could not recall if her earlier trial of Humira had been effective; Dr. Altorok recommended a trial of Humira to treat her FM and back and knee pain. (*Id.*) On examination, Dr. Altorok noted tenderness in the right knee and obesity. (Tr. 596.) Otherwise, examination findings were normal. (*Id.*) Ms. Mears reported that aqua therapy was recommended because she could not do land physical therapy. (Tr. 595.)

On December 14, 2022, Ms. Mears presented to Quality Family Eyecare, Inc. with complaints of ocular irritation. (Tr. 508.) She reported a history of ocular migraines. (*Id.*) She was diagnosed with bilateral ocular pain and anisocoria. (*Id.*) She was advised to discuss the side effects of Cymbalta with her doctor. (*Id.*)

Ms. Mears participated in seven aquatic physical therapy visits at UT from November 23, 2022, through January 18, 2023. (Tr. 468-74.) She was discharged after reporting no change in her quality of life and no decrease in pain. (Tr. 470.) Ms. Mears's greatest limitation to achieving her physical therapy goals was noted to be pain. (*Id.*)

At a December 29, 2022 Comprehensive Care Center Obstetric and Gynecology Clinic appointment with Madison Katich, PA-C, at UT, Ms. Mears did not have lower extremity edema or motor weakness. (Tr. 904-05.) Her gait, mood, and affect were normal. (Tr. 905.)

A January 5, 2023 MRI of Plaintiff's left knee showed patellar chondromalacia subarticular edema. (Tr. 637.) There was no meniscal tear or ligamentous injury. (*Id.*)

On February 15, 2023, Ms. Mears presented to Drs. Abugharbyeh and Altorok for follow up. (Tr. 454.) Ms. Mears reported no improvement with Humira, stating her fatigue was worse and she had a new skin rash. (*Id.*) She reported severe generalized pain, fatigue, and brain fog. (*Id.*) She was not able to perform daily tasks due to her pain and had not been able to work due to pain and fatigue. (*Id.*) Her examination noted cervical tenderness and 18 out of 18 tender spots with no swelling. (Tr. 455.) Ms. Mears's appearance was normal. (*Id.*) There were no focal deficits, and she was alert and oriented to person, place, and time. (*Id.*) Lyrica was prescribed for Ms. Mears's FM. (Tr. 456.)

On February 21, 2023, Ms. Mears returned to Dr. Kamel for medication management. (Tr. 779-84.) She reported increased pain from FM and rheumatoid arthritis. (Tr. 780-81.) She reported that her physician told her there were few medication options left to try to alleviate her pain and recommended that she consider applying for disability. (Tr. 781.) She was having a difficult time adjusting to the idea of not working again and reported a "depressed mood, anhedonia, crying spells, hopelessness, helplessness, guilty thoughts, and difficulty with concentration." (*Id.*) She also reported "edginess and restlessness," irritability, feeling more fatigued than usual, impaired concentration, difficulty sleeping, and increased muscle aches and soreness. (*Id.*) Her noted strengths included adherence with appointments and medication and a good support system. (*Id.*) She was alert, clean, dressed appropriately, neat, and well-groomed on examination. (Tr. 783.) She appeared healthy and cooperative and pleasant with normal behavior, speech, and language. (*Id.*) She was euthymic with an appropriate and congruent affect. (*Id.*) Her thought process was goal-directed and linear and her thought content was intact. (*Id.*) She was oriented to person, place, and time. (*Id.*) Her attention, concentration, memory, and insight were intact. (*Id.*) She was assessed as reliable with average intelligence.

(*Id.*) Dr. Kamel recommended that Ms. Mears continue Cymbalta 30 mg once a day for management of major depressive disorder and generalized anxiety disorder. (*Id.*) Ms. Mears's Cymbalta dose was subsequently increased to 60 mg once a day due to reports of "worsening depression with adjustment to the possibility of not working again." (Tr. 791.)

Ms. Mears returned to Dr. Kamel on March 28, 2023. (Tr. 790-95.) Her examination findings were similar to those from her February appointment. (*Compare* Tr. 793 *with* Tr. 783.) Dr. Kamel continued Cymbalta and provided a referral for therapy. (Tr. 795.)

On April 5, 2023, Ms. Mears returned to Dr. Altorok. (Tr. 570.) She reported severe pain all over her body consistent with FM. (*Id.*) She described the pain as intense and felt it was causing depression. (*Id.*) She had been having thoughts of hurting herself but reported that she was no longer having those thoughts. (*Id.*) Her examination noted cervical tenderness and 18 out of 18 tender spots with no swelling. (Tr. 570-71.) Ms. Mears was noted to be obese, but her appearance was normal. (*Id.*) There were no focal deficits, and she was alert and oriented to person, place, and time. (*Id.*) Dr. Altorok noted that Ms. Mears had failed treatment with Lyrica. (Tr. 571.) Dr. Altorok started her on gabapentin, with tramadol for severe pain. (Tr. 571, 573.) He referred her to physical and occupational therapy. (Tr. 571.) Ms. Mears requested a wheelchair to improve her mobility and Dr. Altorok felt the request was reasonable and prescribed a manual wheelchair. (Tr. 571, 573.)

On April 18, 2023, Ms. Mears presented to UT for a physical therapy evaluation. (Tr. 799-803.) Aquatic physical therapy was recommended for eight weeks. (Tr. 802.)

On April 19, 2023, Ms. Mears presented to Jason Levine, Ph.D., in the UT psychiatry clinic for management of depression and coping with FM and rheumatoid arthritis. (Tr. 804.) She reported suicidal and homicidal ideation. (Tr. 804, 806.) Mental status examination

findings were normal. (Tr. 805.) Dr. Levine found that Ms. Mears met the criteria for major depressive disorder, moderate recurrent. (Tr. 806.) He recommended that Ms. Mears engage in CBT-therapy and continue with the medications prescribed by Dr. Kamel. (*Id.*)

On April 21, 2023, Ms. Mears presented for aquatic therapy. (Tr. 807.) She rated the pain in her low back, right knee, ankles, feet, and hands a 7-8/10. (*Id.*) She entered the pool "with modified independence and use of a handrail for safety, however [she] exit[ed] [the] pool with [a] chair lift." (*Id.*) Ms. Mears's reported pain level remained the same at the conclusion of her aquatic therapy. (Tr. 808.)

On April 22, 2023, Ms. Mears presented to the UT emergency room, complaining of eye pain along with headaches, sensitivity to light and sounds, lightheadedness when moving between sitting and standing, and hearing ringing and heart beats in her ear. (Tr. 810.) Physical examination findings were normal. (Tr. 812-23.) She was diagnosed with an ocular migraine and discharged home in stable condition. (Tr. 813, 815.)

Ms. Mears continued to attend aquatic therapy through May 26, 2023. (Tr. 827, 830, 940, 943, 947, 950, 953, 957, 960.) On April 27, 2023, she reported increased pain. (Tr. 827.) She said that she had "increased soreness in [her] ankles 'and weird areas of [her] feet' and 'full body ache'" following her first aquatic therapy session. (*Id.*) She descended the stairs very slowly and was unsteady doing so. (*Id.*) She again entered the pool using a handrail for safety and exited the pool using a chair lift. (*Id.*) At her physical therapy session on May 2, 2023, Ms. Mears reported that her father and boyfriend were planning on building a ramp so she would not have to use the stairs to let the dogs out. (Tr. 831.) She reported her pain level was an 8-9/10 in her knees, ankles, plantar surface of her feet, low back and left eye. (Tr. 830.) Due to her knee pain that day, she used the chair lift to enter and exit the pool. (Tr. 830-31.) She said that she

usually laid down or sat around during the day, but was unable to do either for long periods of time. (Tr. 831.) On May 4, 2023, Ms. Mears reported her pain level was a 6-7/10 in her knees, ankles, and elbows. (Tr. 943.) She reported sleeping well the night before for the first time in a while. (*Id.*) She entered the pool using a handrail and attempted to exit the pool using the stairs but was unable to do so and ended up using a chair lift. (*Id.*)

On May 3, 2023, Ms. Mears returned to Dr. Levine for psychotherapy. (Tr. 1070-73.) She reported that her cutting episodes had decreased, with no cutting over the prior two weeks. (Tr. 1071.) She felt good about her initial therapy session, indicating it felt good to talk and give her mental health attention. (*Id.*) She said she felt like a burden to others. (*Id.*) She reported passive suicidal ideation but denied plan or intent. (*Id.*) On examination, Ms. Mears was depressed but alert, cooperative, and pleasant. (Tr. 1072.) She exhibited normal eye contact and behavior, with intact attention, concentration, and memory. (*Id.*) Her thought process was coherent and goal-directed, and her thought content was intact. (*Id.*) She was oriented to person, place, and time. (*Id.*) She was able to appropriately shift her attention, and her memory, insight, and judgment were intact. (*Id.*) She was observed to have a normal gait. (*Id.*) Dr. Levine recommended that Ms. Mears continue with her current medications and therapy. (Tr. 1073.)

On May 5, 2023, Ms. Mears returned to her internist Dr. Mbaso for follow up after her emergency room visit for eye pain. (Tr. 972-90.) She reported suicidal ideation but no plan. (Tr. 975.) She was working with a therapist, and he was aware of it. (*Id.*) Physical examination findings were normal. (Tr. 975.) She was diagnosed with ocular migraines and major depressive disorder. (Tr. 976-77.) Ms. Mears was referred to neurology for her migraines and directed to continue to follow up with her mental health providers for her major depressive disorder. (*Id.*)

Ms. Mears returned to physical therapy on May 9, 2023, reporting she fell the day before and landed on the couch. (Tr. 947.) She reported "no significant functional changes since initiating therapy," but said therapy felt good; she felt like some of her muscles were getting stronger. (*Id.*) She entered and exited the pool using the handrail. (*Id.*) When she returned for physical therapy two days later, she reported her pain level was an 8/10. (Tr. 950.) She said her back pain was so painful the night before that it kept her up. (*Id.*) She took half of a new muscle relaxer that her rheumatologist had prescribed but felt groggy as a result. (*Id.*) She entered the pool using the handrail and exited using a chair lift. (*Id.*) At her eighth physical therapy session, on May 16, 2023, Ms. Mears reported her pain level in her knees, feet, and low back was a 7-8/10. (Tr. 954.) She felt her feet were hurting more that day because she had recently done a lot of walking. (*Id.*) She entered the pool using the handrail and exited using a chair lift. (*Id.*)

On May 17, 2023, Ms. Mears returned to Dr. Levine for psychotherapy. (Tr. 1073-76.) She reported one cutting episode and expressed her commitment to preventing future episodes. (Tr. 1074.) She continued to report passive suicidal ideation with no plan or intent. (*Id.*) Mental status examination findings were similar to those from her May 3 appointment with Dr. Levine. (*Compare* Tr. 1075 *with* Tr. 1072.) Dr. Levine recommended that Ms. Mears continue with her current medications and therapy. (Tr. 1076.)

Ms. Mears returned to physical therapy on May 23, 2023. (Tr. 957.) She said the pain level in her elbows, wrists, knees, ankles, and low back was a 5-6/10. (*Id.*) She was noticing less pain overall since getting her wheelchair a week earlier. (*Id.*) She also noted improvement in her core and lower extremity strength since starting therapy, but she had not noticed functional improvement. (*Id.*) She entered the pool using the handrail and exited using a chair lift. (*Id.*)

Ms. Mears presented to Dr. Levine on May 31, 2023, for psychotherapy (Tr. 1077-79), and continued to see him throughout June and July (Tr. 1080-82, 1083-86, 1086-89, 1095-98). She described her mood as hopeless and frustrated at visits during this period. (Tr. 1080, 1083, 1087.) She also reported difficulties with insurance and finances. (Tr. 1083-84, 1087.) At times, she reported passive suicidal ideation but denied plan or intent. (Tr. 1077, 1080.) At her June 28 appointment, she described her body as "dying physically," but denied suicidal ideation, plan, or intent. (Tr. 1083.) Mental status examination findings during this period were normal, except that her mood was depressed. (Tr. 1081, 1084-85, 1087-88, 1097.)

On July 11, 2023, Ms. Mears returned to Dr. Altorok for follow up. (Tr. 1310-14.) She reported severe pain all over her body consistent with FM, and felt her pain was causing depression. (Tr. 1310.) She previously considered harming herself, but said she no longer had those thoughts. (*Id.*) She said fatigue, brain fog, and pain prevented her from performing daily tasks and working. (*Id.*) Her examination revealed cervical tenderness and 18 out of 18 tender spots. (Tr. 1311.) No swelling or focal deficits were observed. (*Id.*) Dr. Altorok concluded that Ms. Mears had "definitive fibromyalgia that [wa]s affecting the quality of her life. She [wa]s not able to work and ha[d] significant limitation in her daily activities." (Tr. 1313.) He explained that Ms. Mears's FM diagnosis was "based on 18 out of 18 tender spots on exam," her inability to work due to pain and fatigue, and because her symptoms had been ongoing for over five years. (*Id.*) He indicated that she would benefit from a motorized scooter, as it would improve her mobility while out of the house. (*Id.*) He continued gabapentin and tramadol. (*Id.*)

On July 14, 2023, Ms. Mears presented to Nikila Luke, M.D., overseen by Alina Rais, M.D., for a medication management appointment. (Tr. 1089-95.) Dr. Luke noted that Ms. Mears's prescription for duloxetine was decreased from 60 mg to 30 mg at her last medication

management visit in April because her mood had been improving with pain management. (Tr. 1090.) But Ms. Mears reported that her pain had increased and her functionality decreased since her last visit. (*Id.*) She was mostly bedbound and unable to perform tasks around the house. (*Id.*) She reported worsening symptoms of depression and anxiety and suicidal thoughts a couple of times each month, but also reported a good support system. (*Id.*) She denied recent cutting episodes. (*Id.*) Her examination showed her to be alert, clean, and well-groomed. (Tr. 1092.) Her eye contact was appropriate, and she was cooperative with normal behavior, speech, and language. (*Id.*) Her mood was anxious, depressed, and disheartened; her affect was dysthymic, appropriate, broad, and congruent; and her thought process was goal-directed and linear. (*Id.*) She had passive suicidal thoughts, but no evidence of delusions, hallucinations, homicidal ideation, or current active suicidal thoughts. (*Id.*) She was oriented to person, place, and time, and was able to appropriately shift her attention. (*Id.*) No memory deficits were noted. (*Id.*) Her intelligence was estimated to be average and her social judgment intact. (*Id.*) As to insight, Dr. Luke noted she was slightly aware of being sick and placed blame on "external locus of disorder." (*Id.*) Ms. Mears's gait was observed to be "coordinated, normal, and slow." (*Id.*) Dr. Luke discontinued Cymbalta due to its ineffectiveness, prescribed milnacipran for depression and FM, and advised Ms. Mears to continue therapy with Dr. Levine. (Tr. 1094.)

On July 26, 2023, Ms. Mears returned to Dr. Mbaso, complaining of dizziness that had been ongoing for more than a year. (Tr. 991-1003.) She had noticed an increase in her heart rate, shortness of breath, and palpitations that required her to lie down. (Tr. 944.) Examination findings were normal. (Tr. 995.) Dr. Mbaso ordered testing, which included blood work and a 48-hour Holter monitor. (Tr. 995-96.)

On August 9, 2023, Ms. Mears presented to Dr. Levine for psychotherapy. (Tr. 1098-1011.) She continued to report feeling hopeless and frustrated. (Tr. 1099.) She denied cutting and suicidal ideation. (*Id.*) Except a depressed mood, her mental status examination findings remained normal. (Tr. 1100-01.) When Ms. Mears returned to Dr. Levine on August 23, 2023, her mood was improved. (Tr. 1102.) She attributed her improved mood to starting steroid medication for her inflammatory disease. (*Id.*) Examination findings were unchanged since her last visit with Dr. Levine. (*Compare* Tr. 1104 *with* Tr 1100-01.)

She returned to Dr. Levine for psychotherapy on September 20, 2023 (Tr. 1105-08), reporting an improved mood but increased anxiety due to upcoming medical appointments and a new diagnosis from her rheumatologist (Tr. 1106). She denied any cutting episodes. (*Id.*) She felt like "things [we]re moving forward but she also [did]'t feel fully optimistic." (*Id.*) She reported some short-term memory issues. (*Id.*) Examination findings were unchanged from her August 23 visit with Dr. Levine. (*Compare* Tr. 1107 *with* Tr. 1104.)

On September 15, 2023, Ms. Mears presented to Paul Chacko, M.D., at UT's Heart and Vascular Center for a consultation regarding palpitations, lightheadedness, and near syncope. (Tr. 1199-1205.) Her Holter monitor evaluation did not show anything. (Tr. 1199-1200.) Examination findings were normal. (Tr. 1203-04.) Dr. Chacko found Ms. Mears appeared to have an autonomic imbalance and recommended a tilt table test and echocardiogram to rule out structural heart disease, and a 30-day event monitor for a symptom EKG correlation. (Tr. 1205.)

On September 20, 2023, Ms. Mears presented to neurologist Payal Patel Soni, M.D., at the Cleveland Clinic for a new patient virtual visit for evaluation regarding headaches. (Tr. 1122-27.) Physical examination findings were limited due to the virtual nature of the visit, but Ms. Mears was alert and oriented to person, place, and time. (Tr. 1126.) Her speech was fluent

and appropriate, and she moved her extremities equally. (*Id.*) She reported a remote history of migraine aura without headache, but said she developed a new type of pain a few years earlier, a "daily aching retro-orbital pressure with superimposed exacerbations of debilitating pain with photophonophobia and nausea." (*Id.*) While the etiology of this new pain was unclear, Dr. Soni observed it had "features of NDPH, migraine, and ocular neuropathic pain." (*Id.*) Dr. Soni ordered a brain MRI to rule out a secondary etiology and prescribed zonisamide. (*Id.*)

On September 29, 2023, Ms. Mears presented to rheumatologist Jamie Ann Vondenberg, D.O., at the Cleveland Clinic for an osteoarthritis consultation. (Tr. 1117-22.) She reported pain in her feet, ankles, low back, knees, hands, and wrists. (Tr. 1117.) She said her feet and hands hurt the moment she woke up, her ankles hurt when she walked, and she felt unstable. (Tr. 1118.) She had difficulty writing and was unable to chop, peel, or open jars due to wrist pain. (*Id.*) On review of systems, she reported arthralgias, myalgias, muscle weakness, and morning joint stiffness but no joint swelling. (Tr. 1120.) On examination, Ms. Mears was pleasant and cooperative with an appropriate mood and affect. (Tr. 1120.) Her gait was antalgic, but her cranial nerves II-XII were grossly intact with no motor or sensory deficit. (*Id.*) She had full range of motion of the lumbar spine and full range of motion of the elbows, wrists, hands, hips, knees, and ankles. (*Id.*) She was diagnosed with: positive ANA (antinuclear antibody); chondromalacia of the left patella; FM, and an elevated C-reactive protein (CRP). (Tr. 1121.) Testing and imaging were ordered. (*Id.*)

On October 4, 2023, Ms. Mears presented to Dr. Luke for a psychiatric follow up. (Tr. 1270-76.) She reported that her conditions were stable, but she continued to have pervasive sadness, anhedonia, and hopelessness. (Tr. 1270-71.) She also continued to have poor sleep due to pain, but her insurance had denied a recommended sleep study. (Tr. 1271.) She reported

more brain fog and worsening anxiety symptoms, including difficulty controlling worry, anxiety that was out of proportion with the stressor, restlessness, and irritability. (*Id.*) She recently got a mobility scooter which had "vastly improve[d] her life," and her family helped build her a ramp so she could leave the house with other family members.[1] (Tr. 1271-72.) But she could not go out alone because she could not load the 200+ pound scooter into the car. (Tr. 1272.) She was continuing to see Dr. Levine for therapy every two weeks. (*Id.*) Mental status examination findings were similar to those from her July 14, 2023 appointment with Dr. Luke. (*Compare* Tr. 1273-74 *with* Tr. 1092.) Dr. Luke recommended that she continue with her current medications and therapy and submitted an order for a polysomnogram. (Tr. 1275.)

On October 10, 2023, Ms. Mears returned to Dr. Altorok. (Tr. 1305-09.) She had been prescribed Plaquenil, but said she developed a rash after starting the medication. (Tr. 1305.) Dr. Altorok discontinued Plaquenil and indicated they would use H1 blockers. (Tr. 1307.) Because Ms. Mears reported improvement with a steroid trial, he continued Prednisone at 5 mg. (Tr. 1308.) He reiterated that she would benefit from a motorized scooter. (*Id.*) Ms. Mears met with Dr. Levine for therapy sessions on October 11 and October 25, 2023. (Tr. 1428-31, 1432-35.)

On October 31, 2023, Ms. Mears returned to Dr. Luke for a psychiatric follow up. (Tr. 1262.) She reported her condition was stable and she was taking her medication as directed. (*Id.*) However, she was having anxiety regarding seeing multiple specialists and trying to determine the best way to approach those appointments. (*Id.*) She continued to report brain fog and difficulty finding words, which worsened with increased anxiety. (Tr. 1263.) She reported some improvement in her sleep with medication, but said it had not been working for the past couple of days. (*Id.*) Ms. Mears's mood was anxious on examination but brightened with

[1] She paid for her scooter with funds from her 401(k) account and help from the Ability Center because she could not operate the type of scooter that her doctor had prescribed. (Tr. 56.)

interaction. (Tr. 1266.) Her affect was dysthymic, appropriate, broad, and congruent. (*Id.*) Other mental status examination findings were normal. (*Id.*) Dr. Luke continued Ms. Mears's prescription for Cymbalta, recommended she continue therapy with Dr. Levine, and referred her to the UT functional wellness program for a collaborative approach to chronic pain. (Tr. 1267.)

On November 3, 2023, Ms. Mears returned to Dr. Altorok. (Tr. 1300.) She reported intermittent left-sided numbness and tingling, balance issues, especially with knee bending, and muscle twitching. (Tr. 1301.) Although steroids were still helping with some of her pain, she was still in a lot of pain. (*Id.*) Her rash resolved after discontinuing Plaquenil but some itchiness remained. (*Id.*) On review of systems, Ms. Mears reported trouble swallowing, eye pain, chest pain and palpitations, arthralgias, back pain, joint swelling and myalgias, rash, syncope, and numbness. (*Id.*) On examination, Ms. Mears was noted to be obese with cervical tenderness and 18 out of 18 tender spots. (Tr. 1301-02.) Otherwise, Ms. Mears's examination was unremarkable. (*Id.*) Dr. Altorok noted there was no synovitis shown on a prior ultrasound of the wrist and knee. (Tr. 1302.) It was again noted that Ms. Mears would "benefit from motorized scooter in order to improve her mobility out of the house." (*Id.*) Dr. Altorok added Enbrel. (*Id.*)

On November 13, 2023, Ms. Mears presented to Danny Barazi, NP, at the UT Heart and Vascular Center for follow up regarding her palpitations and near syncope. (Tr. 1190.) She reported frequent lightheadedness and dizziness at rest and with postural changes, which were associated with her racing heart / palpitations. (*Id.*) They discussed a tilt table test, possibly with a provider other than UT. (*Id.*) Examination findings were unremarkable. (Tr. 1195-96.) The 30-day event monitor showed "SVT, long RP tachycardia." (Tr. 1190, 1198.) Her echocardiogram was unremarkable. (Tr. 1198.) NP Barazi referred Ms. Mears to the POTS clinic for evaluation and recommended the tilt table test. (*Id.*) He also planned to consult with

Dr. Chacko regarding the event monitor results and advised that he would contact Ms. Mears if there was anything she needed to do for SVT. (*Id.*)

Ms. Mears met with Dr. Levine on November 29, 2023 (Tr. 1424-27), reporting that her mood was improved since her last session (Tr. 1424). They discussed how best to facilitate a plan with the various specialists she was seeing for her physical conditions. (*Id.*)

On December 1, 2023, Ms. Mears returned to Dr. Soni. (Tr. 1214-17.) Dr. Soni noted that the brain MRI showed: "mild prominence of CSF [cerebrospinal fluid] at optic nerve heads and partial empty sella - suggestive of IIH [idiopathic intracranial hypertension]." (Tr. 1214, 1217.) Different medications were tried to treat Ms. Mears's headaches. (Tr. 1214.) After having some benefit from zonisamide, she wanted to try another medication; but she stopped taking that medication due to side effects. (*Id.*) She reported zero headache free days per month. (Tr. 1214-15.) Dr. Soni explained that it was difficult to tie all of Ms. Mears's symptoms together under a primary headache disorder, but Dr. Soni felt that some of her symptoms had "features of elevated intracranial pressure even though no optic disc edema was seen" on Ms. Mears's ophthalmology exam." (Tr. 1216.) Further testing was recommended, and gabapentin was recommended for symptom management. (*Id.*)

On December 12, 2023, Ms. Mears met with Dr. Luke for medication management. (Tr. 1255.) She reported that her condition remained stable, and she was taking medication as directed. (*Id.*) She was anxious regarding an upcoming lumbar puncture to assess for idiopathic intracranial hypertension. (*Id.*) She reported that POTS was ruled out and she had a sleep study scheduled in January 2024. (Tr. 1255-26.) Sleep was possible with tizanidine, and she tried to get eight hours of sleep at night. (Tr. 1256.) She continued to report pervasive sadness, anhedonia, and hopelessness, with baseline passive suicidal thoughts that had improved. (*Id.*)

She also reported that her symptoms of anxiety were stable, and tramadol helped. (*Id.*) Examination findings were similar to those from her October 31, 2023 appointment. (*Compare* Tr. 1259 *with* Tr. 1266.) Dr. Luke continued Cymbalta, recommended continued therapy with Dr. Levine, referred Ms. Mears to the UT functional wellness program for a collaborative approach to chronic pain, and noted that he would like her to speak with the clinic pharmacist. (Tr. 1260.) On December 21, 2023, Ms. Mears met with Dr. Levine for therapy. (Tr. 1420-23.) She described her mood as stable. (Tr. 1420.) She had lost her dog two weeks earlier and was coping well with the loss. (*Id.*) Ms. Mears was depressed on mental status examination. (Tr. 1422.) Otherwise, her mental status examination findings were unremarkable. (Tr. 1421-22.)

On January 4, 2024, Ms. Mears presented for a virtual follow up with Dr. Soni. (Tr. 1210-13.) Dr. Soni reviewed recent test results, noting the CSF studies were normal. (Tr. 1210.) Ms. Mears reported zero headache free days. (Tr. 1211.) Dr. Soni decreased gabapentin to 300 mg daily due to reported side effects at a higher dose and started Diamox 125 mg. (Tr. 1213.) Ms. Mears had a neuro-ophthalmology evaluation scheduled the following week. (*Id.*)

On January 17, 2024, Ms. Mears presented to Lisa Lystad, M.D., at the Cleveland Clinic for evaluation as to her eye pain. (Tr. 1183.) Dr. Lystad found no clear ocular cause for Ms. Mears's severe photophobia in her eyes, no evidence of disc edema or pallor in either eye, and no fatigable ptosis or diplopia. (*Id.*) Dr. Lystad addressed Ms. Mears's reported "visual snow syndrome," explaining it was an annoying but benign condition with no known cause or treatment. (*Id.*) Dr. Lystad placed an order for a vestibular physical therapy consult. (*Id.*)

Ms. Mears continued to see Dr. Levine for therapy in January 2024. (Tr. 1412-19.) She reported her mood was stable. (Tr. 1412, 1416.) On January 30, she reported that she continued to experience pain that interfered with her mobility and caused concentration difficulties and

fatigue. (Tr. 1412.) Except for a depressed mood, mental status examination findings were normal at her January 10 (Tr. 1417-18) and January 30 (Tr. 1413-14) appointments.

On February 2, 2024, Ms. Mears presented to B. Karabin, NP, at UT's Heart and Vascular Center regarding her orthostatic intolerance symptoms. (Tr. 1185.) Her review of systems was positive for pain in the feet, ankles, hands, low back, and neck. (Tr. 1186.) On physical examination, she was not in distress, had no skin tenderness, and displayed normal range of motion. (*Id.*) She had no focal deficits and no peripheral edema. (*Id.*) Her tilt table test was negative. (Tr. 1187.) She was assessed as "suffering from autonomic dysregulation/ orthostatic intolerance." (Tr. 1188.) Pyridostigmine was added to her medications. (Tr. 1189.)

On February 6, 2024, Ms. Mears reported a possible adverse reaction of hives, red raised areas down her arm, and welts on her legs after receiving an Enbrel injection in January 2024. (Tr. 1298.) She was advised to discontinue Enbrel and monitor her symptoms. (Tr. 1298.)

On February 9, 2024, Ms. Mears presented for a virtual follow up with Dr. Soni. (Tr. 1206.) Dr. Soni noted that Ms. Mears had been referred for vestibular physical therapy and that polarized glasses were discussed. (*Id.*) Ms. Mears had started but then stopped Diamox and Enbrel due to an allergic reaction. (*Id.*) After stopping the medications, her rash cleared. (*Id.*) She had not yet started Mestinon, which was prescribed by cardiology for orthostatic intolerance. (*Id.*) She also had not yet started phentermine, which was prescribed by her rheumatologist for weight loss. (*Id.*) Ms. Mears reported that her headaches were stable, explaining that there were five days out of the month where she had exacerbations and could not function. (*Id.*) Dr. Soni added furosemide 20 mg daily for Ms. Mears's head pressure. (Tr. 1209.)

During a February 12, 2024, follow up appointment (Tr. 1247-53), Dr. Luke continued Cymbalta for Ms. Mears's depression and anxiety (Tr. 1253). They also discussed adding

Wellbutrin for energy and concentration, but Dr. Luke suggested that they may need to discuss adding the medication with her other medical providers. (*Id.*)

On February 15, 2024, Ms. Mears presented to Dr. Levine, reporting that she felt "deflated given ongoing complexities and uncertainties about her diagnostic picture." (Tr. 1408.) On examination, she was depressed. (Tr. 1410.) Otherwise, her mental status examination findings were unremarkable. (Tr. 1409-10.)

On February 27, 2024, Ms. Mears presented to the emergency room with significant pain in her left hip radiating into her groin after bending down the day before and hearing something pop. (Tr. 1315.) X-rays were negative for fracture or dislocation and her pain improved some with Toradol and Norflex injections. (Tr. 1318.) She was discharged home and advised to continue with anti-inflammatories, gentle stretching, and heat packs for likely muscle strain. (Tr. 1318-19.) She was also advised to follow up with primary care if symptoms continued. (Tr. 1319.) On March 4, 2024, Ms. Mears followed up with Dr. Mbaso after her emergency room visit. (Tr. 1234.) On examination, she was not in acute distress. (Tr. 1234.) She ambulated with a cane. (Tr. 1235.) Lumbosacral tenderness was noted and a straight leg raise on the left was positive. (*Id.*) There was no edema in the lower extremities and no cranial nerve or sensory deficits. (*Id.*) Her mood and behavior were normal. (*Id.*) Dr. Mbaso provided referrals for pain medicine and physical therapy for her low back with left-sided sciatica pain. (Tr. 1235-36.)

On March 10, 2024, Ms. Mears presented to the emergency room with complaints of tachycardia. (Tr. 1225.) She noticed her heart racing while she was in the shower. (*Id.*) After getting out of the shower, she was short of breath, fatigued, and dizzy. (*Id.*) Lab work showed no significant findings, and a chest x-ray was negative. (Tr. 1228.) She was diagnosed with rapid heart rate and discharged home in stable condition with instructions to follow up with her

cardiologist as soon as possible. (Tr. 1228, 1231.) On March 12, 2024, in a phone call with her primary care physician's office, Ms. Mears reported that she had stopped taking phentermine at the instruction of her rheumatologist and her heart rate had since returned to normal. (Tr. 1233.)

On March 13, 2024, Ms. Mears returned to Dr. Luke for medication management. (Tr. 1238-46.) She reported that her condition had worsened since her last visit, noting she threw her back out at the end of February and had to go to the emergency room due to intense pain. (Tr. 1238.) Her back was better, but her "brain . . . changed" and she was isolating and withdrawing from her boyfriend and family. (*Id.*) She was not finding joy or motivation in anything. (*Id.*) On examination, Ms. Mears's mood was anxious but brightened with interaction. (Tr. 1242-43.) Her affect was dysthymic, appropriate, broad, and congruent, and her insight was fair. (*Id.*) Other mental status examination findings were normal. (*Id.*) Dr. Luke increased duloxetine for depression and anxiety and added Vyvanse 10 mg daily for depression. (Tr. 1244-45.)

On March 18, 2024, Ms. Mears presented for physical therapy. (Tr. 1289-94.) She ambulated with a straight cane. (Tr. 1292.) She had an antalgic gait pattern with occasional evidence of increased pain that affected her gait pattern and generally decreased gait speed. (*Id.*) Physical therapy twice a week for four to eight weeks was recommended. (Tr. 1294.)

On March 20, 2024, Ms. Mears reported to Dr. Levine that she was more depressed since her last session, with some suicidal ideation. (Tr. 1404.) She had been dealing with medical setbacks that required emergency room visits and medication changes. (*Id.*) Her mental status findings were normal, except that she was depressed. (Tr. 1405-06.)

On March 25, 2024, Ms. Mears presented to Kim Tran, M.D., at UT's Interventional Pain Medicine center for evaluation regarding low back pain radiating into her hips. (Tr. 1277-82.) On examination, she had normal range of motion in all major joints except for back extension

due to pain. (Tr. 1281.) She displayed full strength of the lower extremities. (*Id.*) Tenderness to palpation was noted in the lumbar paraspinal area to slight touch; facet loading was positive on the right; and her bilateral sacroiliac joint was tender to palpation. (*Id.*) Straight leg raise, Faber, hip compression, and thigh thrust testing were negative bilaterally. (*Id.*) Ms. Mears was diagnosed with FM and acute bilateral low back pain with left-sided sciatica. (Tr. 1281-82.) Dr. Tran recommended that Ms. Mears continue with physical therapy, stay active, get a good night sleep, and continue going to cognitive behavioral therapy. (Tr. 1282.)

Ms. Mears continued physical therapy in March and April 2024. (Tr. 1283-88, 1333-39, 1347-51.) On April 17, 2024, Ms. Mears reported falling at home before coming to her appointment. (Tr. 1333.) On April 24, 2024, she said she felt no significant improvement in her back, and believed she had plateaued; she also reported that she had gotten a YMCA membership so she could do aquatic exercises and NuStep exercises. (Tr. 1347.) The plan was to hold off on physical therapy while Ms. Mears started aquatic exercises at the YMCA, to try to improve her exercise and movement tolerance before resuming land-based therapy. (Tr. 1349.)

Ms. Mears saw Dr. Levine twice in April. (Tr. 1396, 1400.) On April 3, 2024, she reported a slightly more positive mood and denied suicidal ideation. (Tr. 1400.) She still continued to experience anhedonia and low energy but had engaged in several activities. (*Id.*) When she returned to Dr. Levine on April 22, 2024, her mood was unchanged from her prior visit. (Tr. 1396.) While she continued to report anhedonia and low energy, her mood appeared brighter, and she reported engaging in higher than baseline level of activity. (*Id.*)

On April 14, 2024, Ms. Mears presented to Andre Aguillon, M.D., for evaluation of extreme fatigue and follow up on the polysomnography. (Tr. 1323-32.) She was diagnosed with sleep-related breathing disorder, insomnia, and hypersomnia. (Tr. 1331-32.) Dr. Aguillon

provided some recommendations, including switching duloxetine from nighttime to daytime use and exercising daily subject to any orthopedic limitations. (Tr. 1332.)

Ms. Mears presented to Dr. Soni on April 18, 2024, for a virtual visit. (Tr. 1342.) Lasix had been stopped due to low blood pressure, and Ms. Mears continued to report severe eye pain. (*Id.*) Lamictal had been prescribed but she had not started it due to issues with other medication. (*Id.*) She reported no headache free days over the prior month, and five headache days with decreased productivity, light sensitivity, and nausea. (Tr. 1343.) Dr. Soni noted that treatment had been limited by medication intolerance and treatment for other disorders. (Tr. 1345.) She found that Ms. Mears's symptoms were stable overall, but they had not been able to treat elevated intracranial pressure due to medication intolerance. (*Id.*) Dr. Soni recommended that Ms. Mears start Lamictal as prescribed and continue working on weight loss for IIH. (*Id.*)

On May 8, 2024, Ms. Mears returned to Dr. Altorok and Dr. Gekonde. (Tr. 1445-47.) She had lost about 10 pounds but described worsening bilateral knee pain and tendonitis. (Tr. 1445.) She also reported wrist pain and numbness in the heels of her feet. (*Id.*) She denied swelling or effusion. (*Id.*) She said she had been ambulating with a cane more recently. (*Id.*) On examination, Ms. Mears's appearance was normal. (Tr. 1446.) She had cervical tenderness and 18 out of 18 tender points but no swelling. (*Id.*) There was mild redness on her left upper arm. (*Id.*) There were no focal deficits. (*Id.*) Her mood and behavior were normal, and she was oriented to person, place, and time. (*Id.*)

### 2. Relevant Opinion Evidence

#### i. Treating Sources

On November 16, 2022, Dr. Abugharbyeh provided a letter stating: "It is my medical opinion that Ms. Mears requires a disability parking placard . . . [because] [s]he cannot walk 200

feet without stopping to rest." (Tr. 514.) Dr. Abugharbyeh stated that the duration of the need was one year. (*Id.*)

On November 9, 2023, Dr. Altorok provided a letter stating: "It is my medical opinion that Ms. Mears requires a disability parking placard . . . [because] [s]he has limited walking ability due to an arthritic condition." (Tr. 1340.) Dr. Altorok stated that the duration of the need was "permanent." (*Id.*)

On May 8, 2024, Dr. Altorok completed a "Work Restriction Report." (Tr. 1448.) Dr. Altorok opined that Plaintiff could sit for four hours in an eight-hour day, stand for one hour, and walk for one hour. (*Id.*) He opined that Ms. Mears would need to change positions often and at will and that she would have to leave her workstation at least once every hour for ten minutes. (*Id.*) He also opined that Ms. Mears would likely miss three or more days of work per month due to exacerbations if employed. (*Id.*) He further opined Ms. Mears could lift and carry ten pounds occasionally and five pounds frequently, and would need a cane for balance, stability, standing, and walking. (*Id.*) He also stated he had prescribed her a motorized scooter and opined that she could walk one block with her cane before needing the scooter. (*Id.*) He rated her pain as "marked," defined as: "preclud[ing] the activity which precipitates the pain"; "restrict[ing] the ability to maintain concentration to less than 80% of a work day"; and "caus[ing] the claimant to be off task 20% or more of the day." (*Id.*) In support of these restrictions, Dr. Altorok stated that Ms. Mears had "severe fibromyalgia and rheumatoid arthritis, not responsive to therapy." (*Id.*)

**ii. Consultative Examiner**

On June 4, 2024, Ms. Mears presented to Donald Terrace, NP, at IMA Evaluations of Ohio for a consultative medical examination. (Tr. 1450-58.) Ms. Mears described a history of

headaches and constant pain that was "multifocal and diffuse." (Tr. 1451.) She rated her pain level as 5/10 at best, and 10/10 at worst. (*Id.*) She said her pain was exacerbated by lifting, carrying, and activities, and that it was relieved with medication and rest. (*Id.*) She could shower, bathe herself, and drive, but she could not cook or perform household chores due to physical limitations. (*Id.*) She read, listened to music, and played video games. (*Id.*) On examination, Ms. Mears was in no acute distress. (1452.) She used a cane to ambulate and her gait with and without the cane was mildly antalgic. (*Id.*) She could walk on her toes and heels without difficulty; her squat was full; her stance was normal; she could get out of her chair without difficulty; and she could get on and off the examination table without difficulty. (*Id.*) Straight leg raise test was negative bilaterally. (Tr. 1453.) Her joints were stable and non-tender, with no joint heat, redness, swelling, or effusion. (*Id.*) There was no cyanosis, clubbing, edema, or muscle atrophy in the extremities. (*Id.*) No sensory deficits were noted. (*Id.*) She had full strength in the upper and lower extremities and displayed full grip strength bilaterally. (Tr. 1454.) Range of motion examinations were normal with no joint deformities noted. (*Id.*)

NP Terrace opined that Ms. Mears could stand for eight hours, walk for four hours, and sit for eight hours in an eight-hour workday. (*Id.*) He opined she had no lifting and/or carrying limitations up to 20 pounds, could lift and/or carry between 21 and 50 pounds occasionally, and could lift and/or carry over 50 pounds occasionally. (Tr. 1454-55.) He also opined that she had no manipulative, hearing, or visual limitations and could perform stooping, kneeling, crouching, and crawling without limitation. (Tr. 1455.) He opined she should never climb ladders, but she could climb stairs and balance occasionally. (*Id.*) He further opined that she had no limitations with driving or most environmental factors, but should not be exposed to unprotected heights and could be exposed only occasionally to moving mechanical parts due to balance issues. (*Id.*)

**iii. State Agency Consultants**

On May 15, 2023, state agency medical consultant Elizabeth Das, M.D., completed a Physical RFC Assessment. (Tr. 89-90.) She opined that Ms. Mears could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday. (Tr. 89.) She opined Ms. Mears could occasionally climb ladders/ropes/scaffolds; and frequently stoop, kneel, crouch, crawl and climb ramps/stairs. (*Id.*) The postural limitations were due to mild degenerative joint disease in the knee. (*Id.*) Dr. Das found no manipulative, visual, communicative, or environmental limitations. (*Id.*) As additional explanation for the RFC, Dr. Das noted that: Ms. Mears had FM with 18/18 tender spots during a February 2023 examination, with good range of motion and strength on examination; Ms. Mears had a coordinated gait and could balance with her eyes open and closed in April 2023; and Ms. Mears was obese. (*Id.*) Upon reconsideration, on October 24, 2023, state agency medical consultant Leon Hughes, M.D., affirmed Dr. Das's findings. (Tr. 99-100.)

On June 19, 2023, state agency psychological consultant Leelavathy Reddy, M.D., completed a Psychiatric Review Technique ("PRT") (Tr. 87-88) and Mental RFC Assessment (Tr. 90-91). In the PRT, Dr. Reddy opined that Ms. Mears had mild limitations in her ability to interact with others and understand, remember, or apply information; she had moderate limitations in her ability to adapt and manage oneself and concentrate, persist or maintain pace. (Tr. 87.) In the Mental RFC Assessment, Dr. Reddy opined that:

> the evidence suggests symptoms are partially consistent with allegations as the above MDIs are established but [activities of daily living] and objective findings do not suggest claimant is precluded from all work. While symptoms do adversely impact ability to persist in some work settings, alleged severity is not supported. Claimant is able to persist at tasks that can be learned in one to three months on the job (toward the middle of this range) within physical limitations.

(Tr. 91.) Upon reconsideration, on October 27, 2023, state agency psychological consultant Jennifer Kutys, Psy.D., reached the same PRT findings as Dr. Reddy. (*Compare* Tr. 97-98 *with* Tr. 87-88.) In her Mental RFC Assessment, Dr. Kutys reached similar findings as Dr. Reddy, but added to her explanation that: Ms. Mears could "concentrate, persist, and maintain pace to carry out simple routine tasks in a structured and predictable work setting"; she could "adjust to minor changes in the work setting and still complete an ordinary routine consistently on an independent basis"; and "[m]ajor changes [would] need to be introduced in advance and then gradually phased in to allow the claimant time to adjust to the new expectations." (Tr. 100-101.)

**C. Administrative Hearing**

At the May 14, 2024 hearing, Ms. Mears testified in response to questions from his attorney and the ALJ. (Tr. 54-72.) A Vocational Expert ("VE") also testified at the hearing. (Tr. 72-82.) The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 23, 74, 75. 76-77), could not perform Ms. Mears's past work but could perform representative positions in the national economy, including cuff folder (52,000 jobs nationally), dowel inspector (47,000 jobs nationally), and bench hand (60,000 jobs nationally) (Tr. 76-77).

When asked how he arrived at the job numbers, the VE explained that he looks up the DOT job code in the browser and then searches the 2022 National Occupational Employment and Wage Estimates using that job code. (Tr. 79.) The VE acknowledged that the identified jobs were updated in the DOT in the 1980s. (Tr. 79.) He said he had done a job analysis of dowel inspectors and placed hundreds of individuals in the dowel inspector job all over the United States, with the last placement in a dowel inspector job about three months earlier. (Tr. 80-81.) Ms. Mears's attorney asked the VE to identify the names of the employers and towns where he

had placed individuals in dowel inspector jobs. (Tr. 80.) The VE stated he could not provide employer names and had placed individuals throughout the United States. (*Id.*) Ms. Mears's attorney asked the VE if he could provide a copy of the written job analysis. (Tr. 80-81.) The ALJ inquired as to when the job analysis was done, and the VE stated it was done fifteen years earlier.[2] (Tr. 81-82.) Given the age of the analysis, the ALJ indicated that she was not going to require that it be provided. (Tr. 82.) Ms. Mears's attorney stated she had no additional questions, but argued that it was Ms. Mears's position that the "[VE] did not identify a significant numbers of current jobs in the labor market."[3] (*Id.*)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

---

[2] The VE also testified that he had done job analyses of the other identified jobs "many years ago." (Tr. 82.)

[3] In a post-hearing submission, Ms. Mears's attorney argued that the DOT descriptions for the identified jobs had not been updated since the 1980s and that SkillTRAN-Job Browser Pro showed the following number of jobs available nationwide: 8 cuff folder jobs, 198 dowel inspector, and 87 bench hand jobs. (Tr. 336.) Thus, she argued that the Commissioner had not met his burden because there were not a significant number of jobs available in the national economy. (*Id.*)

> 1. If the claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.
>
> 4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B. First Assignment of Error: The ALJ's Analysis of Dr. Altorok's 2024 Medical Opinion Lacked the Support of Substantial Evidence and Failed to Build an Accurate and Logical Bridge Between the Evidence and the Result**

In her first assignment of error, Ms. Mears argues in pertinent part that the ALJ erred in evaluating the May 8, 2024 medical opinion from her treating rheumatologist Dr. Altorok.[4] (ECF Doc. 7, pp. 16-20, 24-25; ECF Doc. 12, 1-5, 10.) In that opinion, Dr. Altorok opined that Ms. Mears had significant limitations in her ability to sit, stand, walk, lift, and carry, that she needed to change positions often at will, that she required additional breaks and would miss additional days of work, that she needed a cane for both standing and walking, and that she had marked levels of pain; in a hand-written note, Dr. Altorok explained that Ms. Mears had "severe fibromyalgia and rheumatoid arthritis, not responsive to therapy." (Tr. 1448.) Ms. Mears primarily argues that "[t]he ALJ's rationale for disregarding Dr. Altorok's opinions" reflects that the ALJ "did not properly apply [Social Security Ruling ("SSR") 12-2p] or understand the disease of fibromyalgia."[5] (ECF Doc. 7, pp. 17-18.) In particular, she argues that the ALJ "erroneously focused on a lack of clubbing, cyanosis, and edema along with other indicia not relevant to an analysis of fibromyalgia symptoms," and relied on tests that "are not commonly performed for fibromyalgia, but rather speak to neurological issues." (*Id.* at pp. 18, 20.)

[4] Ms. Mears also argues in the first assignment of error that the ALJ erred in evaluating the persuasiveness of the following additional medical opinions: Dr. Abugharbyeh's November 16, 2022 opinion; Dr. Altorok's November 9, 2023 opinion; NP Terrace's consultative opinion; state agency medical consultants Drs. Das and Hughes's opinions; and state agency psychological consultant Dr. Kutys's opinion. (ECF Doc. 7, pp. 17-18, 21-23, 24-25; ECF Doc. 6-8, 10.) Because the undersigned has concluded that the ALJ erred in evaluating Dr. Altorok's May 8, 2024 opinion, Ms. Mears's arguments as to the other medical opinions need not be addressed herein.

[5] Ms. Mears also argues that the ALJ "fails to discuss and analyze supportability and consistency" and erroneously ignored Dr. Altorok's opinion that she would benefit from a motorized scooter. (ECF Doc. 7, pp. 18-19.) The undersigned does not find these arguments convincing, but they need not be addressed herein given the recommendation that the matter be remanded based on other errors in the ALJ's analysis of the opinion.

In response, the Commissioner argues that the ALJ properly considered Dr. Altorok's opinion and supported her conclusions with substantial evidence, noting that the ALJ "credited Dr. Altorok's opinion to some degree" and "crafted a highly restrictive RFC finding, limiting Plaintiff to less than the full range of sedentary work." (ECF Doc. 10, pp. 10-11.) The Commissioner does not directly respond, however, to the argument that the ALJ's stated reasons for discounting the opinion are not relevant to an opinion based on FM symptoms.

In SSR 12-2p, the Social Security Administration ("SSA") defines fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, *Evaluation of Fibromyalgia*, 77 Fed. Reg. 43640, 43641 (Jul. 25, 2012); *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 860 (6th Cir. 2011) ("Fibromyalgia . . . is a medical condition marked by chronic diffuse widespread aching and stiffness of muscles and soft tissues.") (internal citations and quotations omitted). SSR 12-2p provides guidance on the evaluation of fibromyalgia in disability claims, largely "how to apply pre-existing rules when faced with a claimant asserting disability based on fibromyalgia." *See Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399 (6th Cir. 2016) (citing SSR 12-2p).

Fibromyalgia patients generally "present no objectively alarming signs" and "'manifest normal muscle strength and neurological reactions and have a full range of motion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243-44 (6th Cir. 2007) (quoting *Preston v. Sec'y of Health & Hum. Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). FM is therefore diagnosed largely based on tender points and ruling out other possible conditions. *Rogers*, 486 F.3d at 243-44. In line with this approach, SSR 12-2p identifies the following criteria to establish a medically determinable impairment ("MDI") of FM: a history of widespread pain; at least 11/18 positive tender points;

repeated manifestations of six or more FM symptoms or co-occurring conditions, especially fatigue, fibro fog, waking unrefreshed, depression, anxiety, and IBS; and evidence that other disorders that could cause the symptoms or signs were excluded. 77 Fed. Reg. at 43641-42.

Considering FM's unique presentation, the Sixth Circuit in *Rogers* held that a district court erred in assessing a treating medical opinion when the ALJ "dismiss[ed] or minimaliz[ed]" the claimant's FM based on normal clinical and test results while "neither acknowledg[ing] nor discuss[ing]" other factors that are relevant to FM like observed tender points, ongoing complaints of pain, stiffness, and fatigue, and a "course of treatment evidenc[ing] a process of diagnoses elimination[.]" 486 F.3d at 244. And in addressing state agency opinions that acknowledged a FM diagnosis but found few physical limitations based on a lack of objective findings, the Sixth Circuit observed: "in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant." *Id.* at 245 (citing *Preston,* 854 F.2d at 820).

The Sixth Circuit also concluded in *Kalmbach* that an ALJ's rejection of a treating medical opinion "as unsupported by objective evidence in the record obviously stem[med] from [a] fundamental misunderstanding of the nature of fibromyalgia," noting that the Sixth Circuit had "recognized on more than one occasion . . . that fibromyalgia patients generally 'present no objectively alarming signs.'" 409 F. App'x at 861 (quoting *Rogers*, 486 F.3d at 243). In this context, the court found the ALJ's observation that the "assessments and opinions were unsupported by other objective medical evidence was simply beside the point." *Id.* at 862.

Although *Rogers* and *Kalmbach* were decided under prior SSA regulations, district courts have continued to recognize the relevance of the Sixth Circuit's observations regarding the nature of FM and the evidence relevant to assessing limitations caused by FM. *See, e.g.*,

*Mahsume I. v. Comm'r of Soc. Sec.*, No. 23-10380, 2024 WL 735388, at *4 (E.D. Mich. Jan. 30, 2024) ("The ALJ's emphasis on the lack of objective findings violates binding precedent going back more than 30 years.") (citing inter alia *Rogers*, 486 F.3d at, 243-46 and *Kalmbach*, 409 F. App'x at 864), *report and recommendation adopted sub nom. Ibrahimi v. Soc. Sec. Comm'r*, No. 2:23-CV-10380, 2024 WL 733562 (E.D. Mich. Feb. 22, 2024); *Taylor v. Saul*, No. 19-1289-TMP, 2020 WL 3889027, at *3 (W.D. Tenn. July 10, 2020) (holding "an ALJ errs in rejecting a medical opinion about the severity of fibromyalgia because the objective medical evidence is normal") (citing *Kalmbach*, 409 F. App'x at 862).

Here, the ALJ assessed the persuasiveness of Dr. Altorok's May 2024 opinion as follows:

> The undersigned finds Dr. Altorok's opinion has limited persuasiveness. While Dr. Altorok's treatment records exhibited the claimant had 18 to 18 tender points and tenderness in the cervical back, the lack of swelling or any neurological focal deficits does not support the doctor's severe restrictions on standing, sitting, walking, lifting and carrying or support the opinions regarding the claimant needing to changing position often, needing to leave the workstation periodically, needing a cane for stability and balance, being absent three or more days per month, needing a motorized scooter to walk more than a block and her marked pain causing her to be off-task 20 percent or more of the day (Exhibits 5F/6, 10, 16-17, 6F/3-6, 7F/9-11, 14-15, 23, 26, 35-37, 41-42, 30F/14 and 43F/2). Pain management records demonstrating the claimant was in no apparent distress with no clubbing, cyanosis or edema in the extremities, grossly intact range of motion in all major joints, negative straight leg raise bilaterally, negative hip compression and thigh thrust testing, grossly intact sensation throughout and full strength in the bilateral lower extremities upon objective examination shortly before the opinion was contemplated does not appear to be consistent with such severe limitations either (Exhibit 27F/5). As such, the above does not find those parts of Dr. Altorok's opinion are persuasive.
>
> On the other hand, rheumatology records noted the claimant would benefit from a cane in order to improve her mobility outside of the house at the rheumatology appointment around the time the opinion was contemplated in May 2024 (Exhibit 43F/2). This supports Dr. Altorok's opinion that the claimant would need a cane for ambulation. The claimant herself also stated she was ambulating with a cane during rheumatology appointment around the time the opinion was contemplated in May 2024, which appears consistent with Dr. Altorok's opinion that the claimant would need a cane for ambulation (Exhibit 43F/1). The undersigned finds that part of Dr. Altorok's opinion is persuasive as a result and the residual functional

> capacity accounts for such in finding the claimant can use a cane to ambulate to the workstation.

(Tr. 32-33 (emphasis added).)

Thus, in assessing Dr. Altorok's opinion regarding Plaintiff's ability to sit, stand, lift, and carry, her reported need to change positions, leave the work station, and take time off work, and her reported "marked" levels of pain, the ALJ explicitly found that the severity of the opined limitations was not supported in light of the following objective findings: lack of swelling; lack of neurological focal deficits; lack of apparent distress; no clubbing, cyanosis, or edema in the extremities; grossly intact range of motion; negative straight leg, hip compression, and thigh thrust testing; grossly intact sensation; and full strength in the lower extremities. (*Id.*) But SSR 12-2p and the Sixth Circuit precedent discussed above suggest the only objective finding in that list that may be relevant in assessing Ms. Mears's FM symptoms is the observation that she was "in no apparent distress." (Tr. 33.) The other objective findings listed by the ALJ are "not particularly relevant" to an assessment of limitations caused by FM. *Rogers*, 486 F.3d at 245.

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers*, 486 F.3d at 249 (citing *Houston v. Sec'y of Health & Hum. Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)); *see also* 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the record). Here, the ALJ discounted limitations outlined in a medical opinion from Plaintiff's treating rheumatologist—which were explicitly based on her "severe fibromyalgia and rheumatoid arthritis, not responsive to therapy" (Tr. 1448)—by citing to normal objective examination findings that have long been recognized to be "not particularly relevant" to an assessment of

limitations caused by FM, *Rogers*, 486 F.3d at 245. (*See* Tr. 32-33.) This disconnect undermines a finding that the ALJ's analysis was supported by substantial evidence.

Nevertheless, the undersigned recognizes that an ALJ need not necessarily restate information she articulated earlier in her decision to support a later analysis. *See Crum v. Comm'r of Soc. Sec*., 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec*., 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding an ALJ need not "spell out every fact a second time"). She also need not "discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). For this reason, the undersigned has considered whether a review of the ALJ's written decision as a whole clarifies her findings regarding Dr. Altorok's 2024 opinion

A review of the ALJ's detailed summary of the medical records does reveal that she generally acknowledged additional information that may have been relevant to an assessment of Ms. Mears's FM symptoms, including: complaints of pain to rheumatologists and other providers throughout the longitudinal record; complaints of fatigue, rash, depression, and brain fog; treatments for FM that include medications and therapy; a reported lack of interest in more intensive treatment; observed trigger points, cervical tenderness, and "features of joint hypermobility and diffuse soft tissue tender spots consistent with fibromyalgia"; diagnoses; and various forms of medical testing that rule out other medical impairments. (*See* Tr. 25-32.)

The relevance of such information is evident from SSR 12-2p, which states that ALJs "will consider a longitudinal record whenever possible" in assessing an RFC "because the symptoms of FM can wax and wane," and that "[w]idespread pain and other symptoms

associated with FM, such as fatigue, may result in exertional limitations[.]" *Id.* at 43644. The relevance of such findings is also evident from SSR 12-2p's provision that the factors needed to establish FM as an MDI include: a history of widespread pain; at least 11/18 positive tender points; repeated manifestations of six or more FM symptoms or co-occurring conditions, like fatigue, fibro fog, waking unrefreshed, depression, anxiety, and IBS; and evidence that other disorders that could cause the symptoms or signs were excluded. 77 Fed. Reg. at 43641-42.

In this context, the ALJ's summary of the medical records does identify a volume and variety of evidence that may be relevant to an assessment of functional limitations stemming from FM. (Tr. 25-32.) But when the ALJ explained her reasons for discounting the severity of the limitations outlined in Dr. Altorok's medical opinion, she did not reference the evidence that is understood to be relevant to an assessment of FM symptoms; instead, she explicitly based her findings on objective examination findings that are "not particularly relevant" to a FM symptom analysis.[6] The fact that the ALJ previously summarized evidence that could have appropriately informed her analysis does not correct the error because it leaves unanswered the question that is critical to this Court's analysis: Did the ALJ understand and consider the nature of FM and its symptomatology, including the evidence relevant to an assessment of FM symptoms, when she determined that Dr. Altorok's "severe restrictions" were not supported by or consistent with the evidentiary record? The ALJ's written analysis does not clearly reflect that she did.

It has long been recognized that an ALJ's written analysis must "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877; *see id.* at 881 ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon

[6] As noted above, the ALJ's observation that Ms. Mears was observed to be "in no apparent distress" may have been relevant to a fibromyalgia analysis. But that single, potentially-relevant objective finding is insufficient to correct the larger error identified herein, which is the ALJ's reliance on largely irrelevant findings to support her findings.

which he is relying[.]") (citations omitted). Here, the ALJ's analysis explicitly relies on evidence that is *not* relevant to an assessment of FM symptoms and limitations while omitting reference to evidence that *is* relevant. Because it is not clear whether or how the ALJ considered the record evidence that is relevant to an assessment of FM when she analyzed a rheumatological opinion based on "severe fibromyalgia and rheumatoid arthritis, not responsive to therapy" (Tr. 1448), the undersigned must conclude that the ALJ's analysis of Dr. Altorok's 2024 medical opinion lacked the support of substantial evidence and failed to build "an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Accordingly, the undersigned concludes that the first assignment of error has merit and recommends that the Court remand the ALJ's decision for further proceedings.[7]

[7] Because the undersigned has concluded that remand is warranted based on Plaintiff's first assignment of error, Plaintiff's second assignment of error relating to the vocational expert's testimony need not be addressed herein.

## V. Recommendation

The undersigned recommends that the Court **REVERSE and REMAND** this matter pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings. On remand, the ALJ should consider the entire record and provide an accurate and well-reasoned explanation to support her findings regarding the persuasiveness of all medical opinion evidence, including the medical opinions of treating rheumatologist Nezam Altorok, M.D., ensuring that her stated rationale builds an accurate and logical bridge between the evidence and the result. The ALJ should also ensure that her analysis of evidence and limitations relevant to fibromyalgia is consistent with the governing regulations, SSR 12-2p, and Sixth Circuit precedent.

August 14, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).